**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Filip C. Iacob,

     Plaintiff

v.

Las Vegas Metropolitan Police Department,

     Defendant

**2:14-cv-00923-JAD-GWF**

**Order Granting Motion for Summary Judgment, Entering Judgment for Metro and against Iacob, and Closing Case**

[ECF No. 53]

     Former police detective Filip C. Iacob sues the Las Vegas Metropolitan Police Department (Metro) for discrimination, retaliation, and related claims, alleging that his Metro supervisors and co-workers discriminated against him based on his Romanian origin and retaliated against him for complaining about it.  Metro moves for summary judgment, arguing that Iacob's claims either lack evidentiary support or fail as a matter of law.  I agree, so I grant Metro's motion for summary judgment, enter judgment for Metro and against Iacob, and close this case.[1]

**Background**

     Metro hired Filip Iacob, who is of Romanian national origin, as a police recruit in August 2004.[2]  Iacob was a patrol officer until January 2008, when he was assigned to the property-crimes unit.[3]  Iacob became a detective with the financial-crimes unit that October and remained in that unit until he was transferred to Downtown Area Command in April 2011.[4]  In October 2009, Iacob was temporarily assigned to a joint Metro/Immigration and Customs Enforcement (ICE) task force,

---

[1] I find this motion suitable for disposition without oral argument.  L.R. 78-1.

[2] ECF No. 61-1 at 15.  The parties cite to various reports prepared by Metro to establish the timeline of events in this case and the substance of Iacob's diversity complaints.  For example, both parties rely heavily on Metro's letter to the EEOC.  ECF No. 61-3 (Iacob's exhibit).

[3] *Id.* at 16.

[4] *Id.*

during which time he participated in investigations of financial crimes committed by individuals of Eastern European origin, including Romanians.[5]  Lieutenant Duvall took over supervision of Iacob's section shortly after Iacob was assigned to the ICE task force.[6]

In June 2010, FBI supervisor Tracy Dockery informed Lt. Duvall that two FBI agents had reported to her that Iacob improperly solicited benefits from them in exchange for introducing them to a new confidential informant (CI), and Lt. Duvall began to investigate these allegations.[7]  Also in June 2010, a "blue on blue" incident occurred when Iacob and ICE agents stopped a Metro detective who was surveiling the same targets they were.[8]  Representatives from Metro and Los Angeles ICE had a "de-confliction meeting" to discuss the incident and each organization's information about the investigation a week later.[9]  According to Iacob, everything began to change for him after the blue-on-blue incident and meeting.[10]

Iacob claims that shortly after the de-confliction meeting, he was informed by Las Vegas ICE Special Agent Curry (who was not at the meeting) that the two Metro detectives who attended the meeting made "slanderous" comments about Iacob, including that they did not trust him.[11]  After receiving this information plus unspecified "other reports" that other officers in his division were making derogatory comments,[12] Iacob filed a complaint with Metro's Office of Employment Diversity (OED) on July 19, 2010.  Iacob named six detectives and two of his supervisors, Lt. Duvall and Sergeant Abbondandolo, claiming that the detectives made "slanderous comments" about him

---

[5] ECF No. 61-3 at 2, 4; 61-5 at 2.

[6] ECF No. 61-3 at 3.

[7] ECF No 62-1 at 3.

[8] ECF No. 53-2 at 3.

[9] *Id.*

[10] ECF No. 60 at 7.

[11] ECF No. 61-7 at 10.

[12] ECF No. 60 at 7.

and negative comments about Romanians in general.[13]  Iacob claimed that detective Jagodka asked him "why he was not corrupt/dirty like the other Romanians,"[14] and that he had secondhand information that detectives Downing, Grace, and Gray had commented "fucking Romanians again"[15] and that detectives Hunkins and Chio had slandered him to the ICE agents at the de-confiction meeting by saying that he was untrustworthy.[16]  Finally, Iacob alleged that Lt. Duvall treated him differently than other detectives in the unit and that, when he reported these concerns to Sgt. Abbondandolo, the sergeant failed to take appropriate action.[17]  At the time Iacob filed this discrimination complaint, no internal disciplinary complaints had ever been filed against him.[18]

In August 2010, while Iacob's discrimination complaint was still pending, Lt. Duvall submitted a memorandum to the unit commander reporting concerns about the blue-on-blue incident and Iacob's investigative techniques, including his relationships with confidential informants.[19]  One month later, Lt. Duvall removed Iacob from his temporary-duty assignment with the ICE Task Force and reassigned him to his detective duties with Metro's financial-crimes division.[20]  In November 2010, the OED completed its investigation of Iacob's discrimination complaint and issued a 65-page report in which it concluded that Iacob had not been discriminated against.[21]  The report noted that

---

[13] ECF No. 61-7 at 2.

[14] ECF No. 60 at 8 (citing ECF No. 61-3 at 8).  Notably, Iacob reported that this occurred during a normal conversation with detective Jagodka and that he "was not offended by the comments."

[15] Id. (citing ECF No. 61-3 at 8).

[16] ECF No. 61-7 at 10.

[17] Id.

[18] ECF No. 61-9 at 2.

[19] ECF No. 61-3 at 11.

[20] Id. at 3.

[21] ECF No. 61-7 at 56–66.  The report concluded that Iacob's allegations against five of the six detectives and Lt. Duvall were "unfounded" and that the allegations against Sgt. Abbondandolo and Detective Jogodka were "not sustained."

Iacob provided "vague, confusing, and inconsistent information" and that the majority of his complaint was based on secondhand information and was not corroborated.[22]  On December 6, 2010, ICE deactivated Iacob's task-force officer status.[23]

In late January 2011, Lt. Shingleton took over command of the financial-crimes section from Lt. Duvall.[24]  Two months later, Lt. Shingleton filed the first of three complaints against Iacob with Metro's Internal Affairs Bureau (IAB).  In the first complaint, she alleged that Iacob had refused to comply with her February 8, 2011, order to share investigation information with a fellow detective who was investigating a related case.[25]  One week later, Lt. Shingleton filed a second complaint against Iacob, alleging that he mismanaged a confidential informant by failing to correctly document his private meetings with the CI.[26]  That same day, Iacob filed a retaliation claim with the OED.[27]  The next day, Iacob was temporarily transferred pending the outcome of the investigations against him to a position in Metro's Downtown Area Command where he reviewed surveillance cameras.[28]

While investigating Iacob's retaliation complaint, the OED learned of FBI supervisor Dockery's 2010 report about the alleged improper demands that Iacob had made on two FBI agents and, in turn, reported this information to the IAB.[29]  The IAB then filed a third complaint against Iacob in June 2011, charging that he had engaged in conduct unbecoming of a Metro employee by making the improper demands.[30]  When IAB interviewed Iacob about these allegations, Iacob denied

---

[22] ECF No. 61-7 at 3.

[23] ECF No. 62-1 at 3.

[24] ECF No. 61-3 at 3.

[25] *Id.* at 11; ECF No. 53-2 at 45.

[26] ECF No. 61-3 at 11; ECF No. 53-2 at 46.

[27] ECF No. 61-3 at 3.

[28] *Id.* at 4.

[29] ECF No. 62-1 at 8.

[30] *See* ECF No. 62-1.

that the meeting ever occurred, let alone that he made improper demands.[31]  The IAB added an allegation that Iacob had violated Metro's policy requiring truthfulness at all times when he made these statements.

The OED concluded that Iacob was not retaliated against, and the IAB sustained the allegations against Iacob in all three internal complaints.[32]  Though acknowledging that the allegations in the first and second complaints warranted a less drastic sanction under Metro's Discipline Decision Guide, Captain Greenway and Deputy Chief Owens nonetheless recommended that Iacob be terminated because the untruthfulness charge in the third complaint calls for termination for the first offense under the Guide.[33]

Per Metro policy, Iacob was formally notified of the recommendation for his termination and was afforded a pretermination hearing before a three-member panel.[34]  Iacob attended the pretermination hearing with counsel and testified in his own defense.[35]  The panel recommended that Iacob be terminated, and it forwarded this recommendation to the Sheriff, who made the final decision to fire Iacob.[36]  In its recommendation, the panel stated that it was Iacob's repeated denial of the allegations in the third complaint that warranted his dismissal,[37] reasoning that it "did not believe that the two FBI agents and the FBI supervisor would conspire and craft into a written statement" the meeting "and the details of the conversation that took place" as Iacob theorized.[38]

---

[31] *Id.* at 8–9.

[32] ECF No. 53-2 at 4, 45.  Neither party indicates the dates that these investigations were closed and the findings returned; the reports are not dated.

[33] ECF No. 53-2 at 46;  ECF No. 53-2 at 66.

[34] ECF No. 53-2 at 52.

[35] *Id.* at 16.

[36] *Id.* at 65.

[37] *Id.* at 17.

[38] *Id.*

After Iacob was terminated, he exercised his arbitration rights under the collective-bargaining agreement between Metro and the Las Vegas Police Protective Association.  The arbitrator found by clear and convincing evidence that Iacob was untruthful about the meeting with the FBI agents and concluded that Iacob was terminated for just cause.[39]  Iacob timely filed a complaint with the EEOC, received his Notice of Right to Sue, and filed this case, which Metro removed here.  Iacob asserts six claims: (1) national origin discrimination under Title VII and Nevada state law; (2) retaliation; (3) hostile work environment; (4) intentional infliction of emotional distress (IIED); (5) negligent hiring, supervision, and retention of managerial and supervisory personnel; and (6) breach of the implied covenant of good faith and fair dealing.  He seeks monetary and injunctive relief.

Metro moves for summary judgment, arguing that Iacob's claims either lack evidentiary support or fail as a matter of law.  Metro's lead argument is that Iacob lacks evidence to show that he was discriminated or retaliated against because of his national origin and that Metro had a legitimate, non-discriminatory and non-retaliatory basis for Iacob's termination: he lied during an internal investigation.  Iacob responds that there are three disputes of material fact that preclude summary judgment: (1) he continues to dispute that the meeting with the FBI special agents occurred; (2) he continues to deny that he made any improper demands to these FBI agents; and (3) Sgt. Abbondandolo's statement during the first OED investigation that Lt. Duvall told him that Iacob "couldn't be trusted, that he has concerns with him [ ] based either on his background or his culture," which corroborates Iacob's allegations.[40]

---

[39] ECF No. 53-2 at 83–84.

[40] ECF No. 61-7 at 37.

1

**Discussion**

2    **A.    Summary-judgment standards**

3          Summary judgment is appropriate when the pleadings and admissible evidence "show there

4    is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

5    law."[41]  When considering summary judgment, the court views all facts and draws all inferences in

6    the light most favorable to the nonmoving party.[42]  If reasonable minds could differ on the material

7    facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the

8    facts are undisputed and the case must proceed to the trier of fact.[43]

9          If the moving party satisfies FRCP 56 by demonstrating the absence of any genuine issue of

10   material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts

11   showing that there is a genuine issue for as to the material facts"; it "must produce specific evidence,

12   through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary

13   basis on which a reasonable fact finder could find in its favor.[44]  The court may only consider facts

14   that could be presented in an admissible form at trial in deciding a motion for summary judgment.[45]

15   **B.    Title VII Discrimination**

16         Courts apply the *McDonell Douglas* burden-shifting framework to Title VII discrimination

17   claims.  Under this framework, the plaintiff has the initial burden to establish a prima facie case of

18

19

20

[41] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

21

22   [42] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

23   [43] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

24

25   [44] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

26   [45] FED. R. CIV. P. 56(c).  I overrule Iacob's objections to consideration of Metro's unauthenticated

27   exhibits.  ECF No. 60 at 3–6.  The authenticity of these exhibits is not reasonably in dispute, many of the exhibits are relied on by both parties, and this evidence is capable of being presented in an

28   admissible form at trial.

discrimination.[46]  To survive summary judgment, a discrimination plaintiff must produce evidence showing: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably or that a discriminatory reason motivated the employer.[47]

The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.[48]  If the employer does so, the plaintiff must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[49]  The plaintiff's "evidence must be both *specific and substantial* to overcome the legitimate reasons put forth by" his employer.[50]

**C.      Metro is entitled to summary judgment on Iacob's discrimination claim.**

Metro does not dispute that Iacob is a member of a protected class or that he suffered an adverse employment action.[51]  It contends instead that Iacob cannot make a prima facie case of discrimination because he cannot show that he was qualified to retain his position as a detective after it was determined that he was untruthful in the internal investigation.[52]  Even if Iacob could make a prima facie showing of discrimination, Metro contends that it is still entitled to summary judgment because there was a legitimate, nondiscriminatory reason for his termination: the untruthfulness

---

[46] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[47] *Id.*; *Reynaga v. Roseburg Forest Products*,--F.3d--, 2017 WL 370862 (9th Cir. Jan. 26, 2017) (explaining that Title VII discrimination plaintiffs need not show that similarly situated employees were treated more favorably and may alternatively show that a discriminatory reason motivated the employer).

[48] *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (emphasis in original).

[49] *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

[50] *Aragon*, 292 F.3d at 659 (internal citations omitted) (emphasis in original).

[51] ECF No. 53 at 8.

[52] *Id.* at 8–9.

1  charge.[53]

2       Even if Iacob could make a prima facie showing of discrimination, he fails to rebut Metro's

3  explanation with specific and substantial evidence.  Metro has provided evidence showing that the

4  IAB determined that Iacob lied during an investigation, a three-member panel made up of different

5  individuals also concluded after Iacob's pretermination hearing that he had lied during that

6  investigation and recommended his termination, and an arbitrator then found by clear and convincing

7  evidence that Iacob's termination for being untruthful was justified.

8       To rebut all of this evidence, Iacob cites a few lines of his deposition testimony where he

9  conclusorily alleges that Lt. Shingleton and a co-detective made "comments" about him and that he

10  was not allowed to work cases that had "any type of European nexus."[54]  He does not clarify when

11  these comments were made, their contents, or who told him that he was not allowed to work on

12  European cases, only that he was not allowed to work these cases because Lt. Duvall "decided so."[55]

13  He also points to his testimony that Lt. Duvall "took extra steps to open up any type of investigation

14  that he wanted to" because Iacob filed a diversity complaint against him.[56]  Iacob does not explain

15  how these comments show that Metro's proffered reason for his termination is pretextual, but he

16  contends that whether Metro terminated him because of his national origin "is an issue of material

17  fact that has been highly contested throughout this litigation," precluding summary judgment.[57]

18       This evidence does not give rise to an inference that Metro's explanation is pretextual.[58]

19  Metro has consistently stated that Iacob was fired because it was determined that he lied during an

20  internal investigation when he denied that he had met with and improperly solicited two FBI agents.

21

22  [53] *Id.* at 9.

23  [54] ECF No. 61-1 at 34.

24  [55] *Id.* at 38.

25  [56] *Id.* at 38–39.

26  [57] ECF No. 60 at 15.

27  [58] *Burdine*, 450 U.S. at 256.

28

1   The only supervisory defendant whom Iacob makes any remotely specific allegations against is Lt.

2   Duvall, who was no longer Iacob's supervisor when the three internal complaints against him were

3   filed or when the formal investigation into Iacob's alleged demands on the FBI agents and alleged

4   untruthfulness began.  He does not allege or offer evidence to show any specific discriminatory

5   statements or conduct by the decisionmakers who filed these complaints, found that he had lied, and

6   recommended and affirmed his termination (Lt. Shingleton, the IAB, the pretermination-hearing

7   panel, sheriff, and arbiter).

8        Additionally, it is difficult to see how any Metro employees or supervisors could have

9   conjured up the untruthfulness allegations as a pretext to fire Iacob because of his national origin.

10  The untruthfulness charges (and the charges that Iacob had made the improper demands) were

11  sustained based on the voluntary statements by the FBI agents and their supervisor, which

12  contradicted Iacob's—not anyone at Metro.  Nor is there any evidence that similarly situated

13  employees were treated more favorably than Iacob from which I could infer pretext.[59]  Metro's

14  Discipline Decision Guide expressly calls for termination for a first offense of untruthfulness,[60] and

15  there is no indication that this policy was applied to Iacob unfairly simply because he is Romanian.

16        Accordingly, even if Iacob could make a prima facie showing of discrimination,[61] Metro is

17  entitled to summary judgment on Iacob's discrimination claim under Title VII and Nevada's state-

18  law analog[62] because he fails to establish a genuine dispute of material fact as to pretext for his

19

20  [59] *McDonell Douglas*, 411 U.S. at 805 (that people outside the plaintiff's protected class were treated
21  better for offenses of comparable seriousness may help demonstrate pretext).

22  [60] ECF No. 53-2 at 66.

23  [61] The United States Supreme Court explained in *Reeves v. Sanderson Plumbing Prods, Inc.* that
24  whether summary judgment is appropriate depends on a number of factors, including the strength of
    the plaintiff's prima facie case and "the probative value of the proof that the employer's explanation
25  is false."  530 U.S. 133, 148–49 (2000).  Assuming that Iacob makes a prima facie showing, it is a
26  weak one, which, when combined with Iacob's negligible proof that Metro's explanation is false,
    supports summary judgment.

27  [62] NRS § 613.330(1) is almost identical to Title VII, and courts apply the same burden-shifting
28  analysis.  *See Apececche v. White Pine Cty*, 615 P.2d 975, 977–78 (Nev. 1980).

1  termination.

2  **D.    Metro is entitled to summary judgment on Iacob's hostile-work-environment claim.**

3  To prevail on a hostile-work-environment claim premised on national-origin discrimination,

4  a plaintiff must show: (1) that he was subjected to verbal or physical conduct because of his national

5  origin; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or

6  pervasive to alter the conditions of the plaintiff's employment and create an abusive work

7  environment.[63]  In assessing the third element, courts examine the "frequency of the discriminatory

8  conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

9  utterance; and whether it unreasonably interferes with an employee's work performance."[64]  "The

10  required level of severity or seriousness varies inversely with the pervasiveness or frequency of the

11  conduct."[65]

12  Metro argues that it is entitled to summary judgment on this claim because Iacob lacks

13  evidence to show that he was subjected to any verbal or physical abuse due to his national origin;

14  even if Iacob could make this showing, the conduct was not sufficiently severe or pervasive.[66]  Iacob

15  responds that he has presented ample evidence that members of Metro created a hostile work

16  environment by making inappropriate statements about his Romanian national origin.[67]

17  Assuming that the first two elements are met, this claim falters at the third element.  Iacob

18  cites four lines in a Metro report summarizing Sgt. Abbondandolo's statements during the OED's

19  investigation into his diversity complaint[68] and a portion of his own deposition testimony.  When

20  read in context, Sgt. Abbondandolo's statements do not support a finding that any discriminatory

21

---

22  [63] *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (internal citation omitted).

23  [64] *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal citation omitted).

24  [65] *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (internal quotation marks
25  omitted).

26  [66] ECF No. 53 at 11.

27  [67] ECF No. 60 at 17.

28  [68] ECF No. 61-7 at 37.

remarks about Romanians were sufficiently severe or pervasive to create a hostile work environment. It is true that Sgt. Abbondandolo recounted that Lt. Duvall told him that Iacob "couldn't be trusted" and that he had "concerns with him, uh, based either on his background or his culture" and that he was considering removing Iacob from the task force—a statement on which Iacob relies heavily in his opposition.[69]  But Sgt. Abbondandolo clarified that Lt. Duvall stated that he believed Iacob could not be trusted because "he was close to his source, sources" (who were also Romanian) and whom Iacob "knew,"[70] and because Iacob "was seen at . . . a European or Eurasian business" frequented by a suspect.[71]  Thus, the summary of Sgt. Abbondandolo and Lt. Duvall's conversations as reported by Sgt. Abbondandolo does not support Iacob's hostile-work-environment claim.

Iacob next cites to his deposition testimony that two Metro detectives made disparaging remarks about Romanians at the June 2010 de-confliction meeting.[72]  I recognize that self-serving testimony may give rise to a dispute of material fact, but Iacob's testimony does not state facts of which he would have personal knowledge: Iacob expressly admits in his deposition testimony that he has zero personal knowledge of any discriminatory comments made at this meeting.[73]  In fact, Iacob claims that he learned about them from a third party who also was not at the meeting.  Iacob has not demonstrated how this hearsay evidence would be admissible at trial, and I decline to consider it. The other vague allegations in his deposition testimony to which Iacob cites are likewise insufficient to create a genuine dispute of material fact that any discriminatory remarks or conduct were sufficiently severe or pervasive to create a hostile work environment.[74]  Accordingly, Metro is entitled to summary judgment on claim two.

---

[69]  *Id.* at 36:1807–08.

[70]  *Id.* at 36:1812–1816.

[71]  *Id.* at 36:1783–1789.

[72]  ECF No. 60 at 17.

[73]  ECF No. 61-1 at 39:10–25, 40:1–2.

[74]  ECF No. 60 at 17 (citing ECF No. 61-1 at 33:15–23).

1    **E.    Iacob's retaliation claim fails.**

2        To make a prima facie case of retaliation, a plaintiff must show "that he undertook a

3    protected activity under Title VII, his employer subjected him to an adverse employment action, and

4    there is a causal link between the two."[75]  The burden of production then shifts to the employer to

5    advance a legitimate, nonretaliatory reason for any adverse employment action taken against the

6    employee.  If the employer does so, then the plaintiff has the ultimate burden of showing that the

7    employer's explanations are pretextual.[76]

8        Metro concedes that Iacob engaged in protected activity when he filed a discrimination

9    complaint with the OED and that Iacob suffered an adverse employment action when he was fired,

10   but it denies any causal link between the two.[77]  Even if Iacob could make a prima facie showing,

11   Metro has offered a nonretaliatory basis for his termination.  Iacob responds that he had an

12   unblemished disciplinary record before he filed his first diversity complaint in July 2010 and that

13   there is "more than sufficient evidence in the record" to demonstrate that he was retaliated against.[78]

14       I find that Metro is entitled to summary judgment on Iacob's retaliation claim for the same

15   reason that it is entitled to summary judgment on his discrimination claim: even if Iacob made out a

16   prima facie case, he has not shown that the reasons given for the disciplinary actions against him and

17   his ultimate termination are pretextual.  The record reflects that the first formal internal complaint

18   against Iacob was not filed until March 31, 2011—more than eight months after he filed his first

19   diversity complaint.  Additionally, Lt. Shingleton, who filed the first disciplinary complaint, was not

20   named in Iacob's July 2010 diversity complaint and was not his supervisor at that time, making it

21   less likely that the complaint was retaliatory.  Iacob does not contend that the March 31, 2011,

22

23

24   _____

25   [75] *Vasquez v. City of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003).

26   [76] *Steiner v. Showboat Operating Co.*, 25 F.3d 1464, 1465 (9th Cir. 1994).

27   [77] ECF No. 53 at 12.

28   [78] ECF No. 60 at 18–19.

complaint was unfounded[79] or challenge the sufficiency of that investigation.  Nor does Iacob dispute the validity of the allegations contained in the second complaint that was filed in early April and the outcome of that investigation.

Though Iacob *does* dispute the charges in the third complaint—which was filed nearly a year after his discrimination complaint and about a month and a half after his retaliation complaint—the record reflects that the third complaint and resultant allegations of untruthfulness were uncovered during the diversity office's investigation of Iacob's retaliation complaint.[80]  In adjudicating that complaint and determining that Iacob had lied during an internal investigation, Metro relied on the voluntary statements of the two FBI agents who claimed that Iacob had made the improper demands and of their supervisor.  The FBI agents and their supervisor are not parties to this case, and Iacob does not allege or offer evidence to show that they made false allegations against him because of his national origin.  Even if he had, this action would not be attributable to Metro, which is a wholly separate agency, and there is no evidence in the record to support the inference that these two separate agencies conspired against Iacob because of his national origin.  Finally, the adverse employment action about which Iacob ultimately complains—being terminated in July 2012[81]—did not occur until more than two years after Iacob filed his discrimination complaint and well more than a year after he filed the retaliation complaint.  This timing, along with Metro's well-documented and unchanging explanation for Iacob's termination, precludes an inference of pretext.

Accordingly, even assuming Iacob makes a prima facie showing of retaliation, Metro is entitled to summary judgment on this claim because Iacob lacks evidence to show that Metro's proffered reasons for any adverse employment actions are pretextual.

---

[79] ECF No. 53-2 at 45.

[80]  ECF No. 62-1 at 8.

[81] ECF No. 1 at ¶ 60.

1    **F.    Iacob's remaining state-law claims fail.**

2          *1.    IIED*

3          Metro argues that Iacob's IIED claim fails because he lacks evidence to show extreme and

4    outrageous conduct by any Metro employee or that any action was taken with the intention of or

5    reckless disregard for causing him severe emotional distress.  Even if he could show these elements,

6    Metro contends that Iacob's claim nonetheless fails because he lacks evidence to show that he

7    suffered severe distress, let alone that any distress was caused by Metro.[82]  Iacob responds that the

8    alleged discrimination and retaliation are extreme and outrageous and that he suffered severe stress

9    and humiliation because of Metro's actions, for which he was briefly hospitalized.[83]

10         To prevail on a claim for IIED under Nevada law, a plaintiff must show: "(1) extreme and

11   outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress,

12   (2) the plaintiff's having suffered severe or extreme emotional distress, and (3) actual or proximate

13   causation."[84]  "[E]xtreme and outrageous conduct is that which is outside all possible bounds of

14   decency and is regarded as utterly intolerable in a civilized community."[85]  Even construed in the

15   light most favorable to Iacob, his allegations do not even approach this standard.  Metro is therefore

16   entitled to summary judgment on Iacob's IIED claim.

17         *2.    Negligent hiring, supervision, and retention*

18         Metro next argues that it enjoys discretionary-function immunity from Iacob's negligent-

19   supervision claim.[86]  Iacob responds that, because Metro violated Title VII by discriminating and

20   retaliating against him, it cannot claim immunity.[87]

21

22   _____

     [82] ECF No. 53 at 15–16.

23   [83] ECF No. 61-1 at 66–67.

24
     [84] *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999).
25

26   [85] *Maduike v. Agency Rent-A-Car*, 953 F.2d 24, 26 (Nev. 1998).

27   [86] ECF No. 53 at 13–14.

28   [87] ECF No. 60 at 19–20.

The Nevada Supreme Court has adopted the Supreme Court's *Berkovitz-Gaubert*[88] test to determine whether a state official's actions are protected by discretionary immunity and thus typically looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct qualifies.[89]  As Metro points out—and Iacob does not contest—the Ninth Circuit Court of Appeals and other circuits have consistently held that "'decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield.'"[90]  This claim thus rises and falls with Iacob's Title VII claims, which I have already found lack evidentiary support.  Accordingly, Metro is entitled to summary judgment on Iacob's negligent-supervision claim based on discretionary immunity.

### 3.  Breach of the implied covenant of good faith and fair dealing

A claim for breach of the implied covenant of good faith and fair dealing lies when "the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract."[91]  Metro argues that it is entitled to summary judgment on this claim because Iacob had no employment contract with Metro; he was instead a local government employee as defined by NRS § 288.025 whose conditions of employment were governed by a collective-bargaining agreement.[92]  Even assuming this agreement gives rise to a contractual relationship between Iacob and Metro, Metro argues that Iacob was afforded all of the rights under the agreement, and he has failed to identify how the spirit of that contract was contravened.[93]  Iacob offers no response.

---

[88] *See Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991).

[89] *Martinez v. Maruszczak*, 168 P.3d 720, 727–29 (Nev. 2007); NEV. REV. STAT. § 41.032(2).

[90] *Neal-Lomax v. Las Vegas Metro. Police Dept.*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008) (citing *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (collecting cases)).

[91] *Hilton Hotels* v. *Butch Lewis Productions, Inc.*, 808 P.2d 919, 919 (Nev. 1991).

[92] ECF No. 53 at 14.

[93] *Id.* at 14–15.

1    Though I recognize that summary judgment cannot be granted by default, Metro has shifted

2   the summary-judgment burden to Iacob to show that there is a sufficient evidentiary basis on which a

3   reasonable fact finder could find in its favor.[94]  Iacob has not met this burden.  He does not argue or

4   offer any evidence from which a reasonable fact finder could conclude that Metro violated the spirit

5   of any contractual agreement with him.  Indeed, he appears to tacitly acknowledge that he had no

6   employment contract with Metro that could contain an implied covenant of good faith and fair

7   dealing because he did not assert a claim for wrongful termination.  Metro is therefore entitled to

8   summary judgment on Iacob's sixth and final claim for relief.

9                                   **Conclusion**

10    Accordingly, with good cause appearing and no reason to delay, IT IS HEREBY ORDERED,

11   ADJUDGED, and DECREED that Metro's motion for summary judgment **[ECF No. 53] is**

12   **GRANTED.**  The Clerk of Court is directed to enter judgment for Metro and against Iacob and

13   CLOSE THIS CASE.

14    Dated this 9th day of February, 2017.

15                                                    _____
                                                     Jennifer A. Dorsey
16                                                   United States District Judge

17

18

19

20

21

22

23

24

25

26

27   _____

28   [94] *Orr*, 285 F.3d at783; *Bhan*, 929 F.2d at 1409; *Anderson,* 477 U.S. at 248–49.